THE STATE OF KANSAS, *ex rel.*, v. M. D. UMBARGER *et al.*

No. 13,562.  (76 Pac. 429.)

SYLLABUS BY THE COURT.

SCHOOLS AND SCHOOL DISTRICTS— *Erection of Schoolhouse— Power of District Meeting.* A union school district caused bonds to be issued and sold for the purpose of building a schoolhouse. The board of directors were proceeding to erect such building upon the site selected for that purpose and had expended considerable money and incurred obligations in putting in a foundation and procuring materials, when at a district meeting, duly called, they were ordered to suspend work on the schoolhouse and dispose of the material purchased. *Held*, that such orders were within the power of the district meeting and were binding upon the district board, and that they should be required by the court, in a proper action therefor, to obey the same.

Error from Chase district court; DENNIS MADDEN, judge. Opinion filed April 9, 1904. Reversed.

*Kellogg & Madden*, for plaintiff in error.

*Cochran & Grisham*, for defendants in error.

The opinion of the court was delivered by

CUNNINGHAM, J. : The state of Kansas, upon the relation of F. A. Meckel, as county attorney of Chase county, sought by this action to restrain and enjoin the defendants, who together constitute the board of

directors of union school district No. 4, of Chase county, from proceeding with the erection of a school building for the use of that district.   This order was denied by the district court, and the plaintiff seeks a reversal of that action.

From an agreed statement of facts found in the record it appears that union school district No. 4 was duly formed out of territory formerly composing districts Nos. 4 and 23, both of which had old schoolhouses.   At a meeting held for that purpose on May 10, 1902, union district No. 4 voted to issue bonds in the sum of $2000 for the purpose of building a new schoolhouse.   These bonds were issued and sold and that sum came to the hands of the defendants for the purpose designated.   The same meeting selected a site for the proposed schoolhouse, but no directions were then or afterward given to the board when to build or the kind or character of house to build.   Some time before August 12, 1902, the board procured a bond for a deed to the site selected and on that day, having agreed upon the kind of a house, and obtained plans therefor, began its erection.   They put in a foundation, purchased lumber, hired carpenters, made window- and door-frames, created obligations, and made expenditures in the total sum of $1232, exclusive of the amount agreed to be paid for the site.   They were proceeding with the erection of the house, with a view of getting it ready for occupancy by November 1, 1902, when, on September 9, 1902, a request was presented to the board, sufficient in form and signed by a sufficient number, to call a special meeting of the qualified electors of the district for these purposes :

"To take such action as may be deemed advisable as to the erection of a schoolhouse or suspend the erection of the same ; to contract for the building, or refuse to contract for same at this time ; to sell or dis-

pose of any material on hand, or pay for any purchased by the board ; and to pass such orders as may be deemed necessary as to anything and everything pertaining to the interests of said district generally.''

In pursuance of that request a district meeting was duly called for September 20, 1902, which on that date adopted the following resolutions by a vote of 29 to 11 :

''That the board is hereby instructed to suspend work on new schoolhouse..
. ''That the board is hereby instructed to sell any material purchased, to the best interests of the district.''

The board, however, conceiving that they were not required to obey these instructions, were proceeding with the erection of the house under construction when this action was brought to compel compliance with the orders of the district meeting. It further appears that on August 30, 1902, some fifty-three of the resident taxpayers of union school district No. 4, probably being a majority of such taxpayers, joined. in a petition to the county superintendent of public instruction to divide such district and resolve it into the two original districts ; this petition, however, was denied by him upon the ground that no warrant of law existed for such action. Schools were being conducted in both the old schoolhouses, the contracts with the teachers having been made, however, with a view of transferring them to the new house when completed.

The contention here arises over the authority of the school-district meeting to make the orders it did on September 20, 1902. No claim is made that this meeting was not lawfully assembled, or that, if it could act at all upon the matter involved, its action was not regular. It is denied by the board that the action taken was within the powers of the electors.

In the discussion of this question we shall not refer to the fact that the board never received any instructions from the district meeting as to the time when they should proceed in the erection of the house or the kind of a house they should build, but shall proceed upon the assumption that the authority given was sufficient to cover these points ; or, if not, that such lack of authority was cured by the passage of chapter 347, Laws of 1903, enacted February 27, 1903.   The question then is, Had the district meeting authority to direct the suspension of the work on the new build ing and the disposition of the material on hand, as it attempted to do, and is its agent, the district board, bound to obey such order?

This district is what is known to our law as a "union school district."   By section 6157, General Statutes of 1901, such district is made a body corporate, and presumably, as such body, has a right to direct its own affairs.   The duties and powers of its board of directors are the same as those provided by law for other school-district boards.   The entire act relative to such union districts clearly points to the conclusion that after they are once organized they are to be governed in the same manner, and pass under the same statutory regulations, as other school districts.   They are, indeed, but school districts of larger size, formed by the union of other districts.

By section 6127, General Statutes of 1901, the qualified inhabitants of a school district lawfully assembled have power

"to authorize and direct the sale of any schoolhouse site or other property belonging to the district when the same shall be no longer needful for the use of the district."

Section 6181 directs that the district board

"shall build, hire or purchase such schoolhouse as the voters of the district, in a district meeting, shall have agreed upon, out of the funds provided for that purpose, and make sale of any schoolhouse site or other property of the district, . . . when lawfully directed by the voters of such district at any regular or special meeting."

The only limitation upon the power of the district meeting in the management of its affairs in respect to the sale of property belonging to it is "when the same shall be no longer needful for the use of the district." Who then is to decide when this condition exists? This decision, of course, must rest either with the school-district meeting itself or with the courts. Here the school-district meeting assumed to determine it. No claim is made that its determination was influenced by other than honest motives or the best of reasons; indeed, no reason appears in the record why it chose by so large a majority to take the action it did. If we were disposed to indulge in speculation we might imagine a variety of very good reasons, but we do not think that either the district court or this court has any authority, in the absence of any claimed corruption, to inquire into those reasons: The law leaves the district meeting to manage those matters as it may choose. As the taxpayers must foot the bills, they are entitled to determine the expenditures and conduct of the business. The authority conferred by the quoted statute is broad enough to cover the property ordered to be sold. They may direct the sale of "other property;" hence, why not lumber or window-frames as well as an old stove or discarded furniture? The right to sell must of necessity carry with it the right to determine the propriety of selling. If the propriety of selling were a question

to be determined by the court, the court would be vested with a supervisory power in the management of the affairs of the district, not only as to the sale of property, but in other matters, for the school-district meeting is vested with discretion by the use of similar language, or inferentially, as to many of the duties committed to it.  The courts would indeed have a very busy time were they to undertake to supervise the actions of various bodies and boards created by the statutes and endowed with various powers by language similar to that here employed.

The case of *School District No. 6, in Dresden v. Ætna Insurance Co.*, 54 Me. 505, was very similar to the one at bar.  The district had voted to sell the new schoolhouse.  The authority found in the statute under which it acted was "to sell and dispose of any schoolhouse or other property, if necessary."  It was there contended that the sale of the house was bad policy and was not necessary.  The trial court submitted the question of necessity to a jury, which found that no necessity existed.   The supreme court held that the school district was the exclusive and final judge of the necessity of the sale ; that the voters were interested in the most judicious disposition of the property, they knew the present necessities as well as the future wants of the district better than strangers possibly could, and that the matter was their business.   This case cites many others supporting the same view.

The suggestion is made by defendants in error that their acts in proceeding as they did in purchasing material and commencing the building were all ratified by the delay of the district meeting in countermanding such action, and that by reason of such ratification the district may not now suspend the further

prosecution of the work. We see no basis for such claim. The work which the board was doing was not for themselves—they had no interest personal in its prosecution ; they were acting for their principal, the union school district, in its corporate capacity, and must take their orders from it. Their authority was a limited and special one, dependent upon the legally expressed will of the district. (*School District v. Brown*, 2 Kan. App. 309, 43 Pac. 102.)

We think the order given them by the district meeting on September 20, of which they had full notice, was well within the powers of such meeting and must be obeyed by the board. It may or may not be wise. The district court did not think it was. The district meeting may have been better situated than was the court correctly to determine the question, but, whether it was or not, the question was one for the meeting and not the court to settle.

The judgment of the district court will be vacated, and the cause remanded with directions to grant the injunction.

All the Justices concurring.